Welcome to the Court of Appeals for the Sixth Circuit. Before we begin, I wish to assure you that the panel is prepared for the cases this morning. We have read and reviewed your briefs. Because we are prepared, we would prefer it if you would please spend your time not reading from your briefs, not reciting the statement of facts in your case, but rather arguing the most critical issues in the case. We will assume that issues that are not argued today that you rely upon the arguments contained in your briefs. Finally, if your counsel for appellant and wish to reserve some time for rebuttal, please so indicate to me and also to our court officer. With that, you may call the first case. Case No. 13-3118, Joe D Ambrosio v. Carmen Marino, et al. Oral Argument. Please reserve two minutes for plaintiff and defendant to be served by defendants. Mr. Norquist, may I help? We have your honor. Thank you. Your honors, this appeal obviously in its essence boils down to Iqbal and Twombly and how they apply here. And what I want to start out with right away is an explanation of why the complaint in this case is actually worlds apart from the insufficient complaints in Twombly and Iqbal. And it really boils down to one fundamental reason. That's as follows. Joe D Ambrosio's complaint in this case is built upon proven, repeated misconduct by the county prosecutor's office, particularly Carmen Marino, who handled this trial. It is built upon that proven, court-found misconduct that there is no doubt occurred. And what our complaint simply asks, or simply alleges, is that there's a plausible inference that that misconduct, that unrebutted misconduct, extends into that office. I'm sorry, keep your voice up, counsel. My dog ate my hearing aids. I understand, your honor. My dad just got some a couple months ago, so I'll do that. There's a plausible inference that the misconduct in this case may be evidence of a policy, custom, or practice. That's what you're saying? Yes, the question is, is there a plausible inference that in light of the documented, repeated misconduct in this case, is it a plausible inference that that misconduct plausibly extends to some extent? Have you made any factual allegations to that effect in the complaint? Yes, we have made some factual allegations to that extent. Rather than just conclusions? Yes. Part of it, of course, is you're in a situation where you need discovery to ferret out as much of those facts as you can get. What we have at this point, in addition to the documented findings of the courts in the habeas proceedings of the misconduct, in terms of specific indications of policy of misconduct from that office, one example, you have the documented finding by the federal court that Mr. Marino's policy, and there's no indication that it was limited to him, was that defense attorneys did not have full access to the documents in the case, but that the prosecutor instead read selected portions to the defense counsel. Judge Kathleen O'Malley noted that this was Marino's policy. Isn't it true, though, that if you have some sort of official who has himself a policy of doing something, even if it's not subject to review by supervisors, that that doesn't seem to be enough to establish a policy for the whole organization, for the whole county, right? Well, there's two sort of points we need to be very clear on that your question raises. One is that you can establish municipal liability, the county's liability base, one, that they have had a pattern or practice through their actions, which may be shown through Prosecutor Marino, through other prosecutors, through various misconduct, and you separately could establish that municipal liability based on even single actions of a policymaker. I think your question is going to the policymaker. Yes. Okay. And just because nobody was supervising him in this practice of his own, to me, I don't see how that makes a county policy. I want to give you a chance to explain. Well, and we point out in the reply brief, no, in our opening brief, we point out a couple of cases where even assistant prosecutors, which Marino's, that was Marino's official title, very high-level prosecutor, but not the prosecutor for the county. And the cases show that it depends on the facts, including such facts as how much discretion that prosecutor really had, how much administrative control that prosecutor had, including control over other prosecutors. But those cases show that when you allege sufficient facts indicating that that person is running the prosecution and committing misconduct, that you have at least the plausible inference and potential for facts that this person is actually acting with such discretion that they speak for the county. Now, we point out a couple of cases where the courts say, yes, you have at least enough to proceed to summary judgment so that we can see what those facts really bear out about that particular prosecutor's discretion. The defendants in this case don't respond to those cases. Are they post-Trombley cases? I believe there's two in there that are post-Iqbal, Your Honor. And so this is sort of the second avenue by which the entity itself can be liable here. That is that Mr. Marino is at least arguably, at this pleading stage, has sufficient discretion to be considered a policymaker for the county. I would add, however, that I frankly believe there's a stronger way to hold the county liable. I think that route is very strong because the defendants don't counter the cases I just mentioned. But the fundamental aspect that this repeated, proven misconduct, which I think is incredibly unusual at this stage of a civil case. You have an incredible habeas record here of undisputed misconduct from this prosecutor coming out of this county. And again, the question is, do the three of you have in your mind the idea that there's a plausible inference that all that misconduct could extend into that county office? Extend in what sense? Other actors? Other cases by Marino that we don't know about? I mean, how far does this have to moustasticize, or whatever that word is, before you have Monell liability? Well, I think that question is the heart of everything here. It's what plausible inference can you make based on what we know now about how far things extended into that office? And I think the policy I mentioned before, the idea of reading these documents and things like that, there's no indication that this is limited to Marino. How far does it have to go, is what I'm asking? How far do I have to infer that this might go in order for you to cross the line? I think you need to infer that you have to have a reasonable inference that, generally speaking, that county, through I would say a substantial, maybe possibly majority of the people in there, either acquiesced or actually practiced this sort of misconduct. What I mean by this misconduct in very plain terms is a sense of cutting corners or cheating to win. The things that happened to Mr. D'Ambrosio, Ronald Larkins two years before, and the reason that inference is reasonable is because there's so much misconduct, it is so egregious with the highest stakes possible, and Mr. Marino wasn't there for a month and kicked out. This guy was at the top, not the very top, but he was the big deal prosecutor. I mean, it got to a point where they were naming awards after the guy. Then they had to scratch his name off because of the disgrace of that office. Now the question is, with this documented, proven misconduct, is there a fair, plausible inference at this pleading stage that just maybe that misconduct was... But you've got a bad actor making that assumption. How does that infer that the county has established some kind of bad policy or condoned some... Sure, sure. You've basically got two possibilities here with Marino's conduct and the conduct of the county over these years. You've got the possibility that the defendants posit, we've got a bad apple. We've got a bad apple who's been here for a long, long time. He's cut corners in a lot of cases and it's had disastrous consequences. Or you've got the possibility that actually that bad apple was there for so many years doing these things repeatedly and the entity itself didn't have a problem with it or condoned it or continued and extended those actions. The point about Iqbal and Twombly that I think goes to this point about what is really a reasonable inference here. That's what it comes down to. It's the point I started with. Iqbal and Twombly are worlds apart and here's why. If you remember Iqbal and Twombly and you remember the facts of those complaints, Twombly's the antitrust one, Iqbal. Those facts the plaintiffs came up with there perfectly fit consistent with appropriate conduct by the defendants. In Iqbal it was parallel economic conduct, or Twombly. In Iqbal it was the detainment of Muslim American men which was disproportionate. And the court pointed out that's perfectly consistent with proper conduct by the defendants. We're not going to make the analytical leap to say it's conceivable that your theory as a plaintiff could fit those facts with misconduct. Here, completely different, we have documented proven egregious misconduct by this office over a period of years. And the only question is, is there a fair inference that based on all the facts we've put in from the habeas proceedings, that actually infected that office? It has to be plausible, right? It has to be plausible. That's the critical phrase. And, I mean, Twombly says we shouldn't speculate that maybes are not enough. That it has to be a plausible claim stated in the complaint to go to the discovery stage. And that's what we'll decide. And you agree it's objective rather than subjective, don't you? You say whether the three of us have in our minds that this could have happened, well, whether we think it could have happened, the evidence has to show it, doesn't it, to be a plausible claim? Of course it does. And the reference I made there was really having in mind the Supreme Court statements about judges, and of course this is a de novo review, assessing in their own common sense and judicial experience. That's why the reference is, do you believe there's a plausible inference for us to, All we're really asking for at this stage, of course, is do we have enough here that maybe we should take some depositions and find out what was really going on. Let me ask you, I mean, let's say hypothetically that Marino is not a policymaker for purposes of county liability. But we've got a record where Marino, you know, egregiously violates Brady in this case. There's another case two years before, apparently, where that also involved Brady violations. You've got ten other cases where I gather, and first of all, are those ten other cases referenced in the complaint? They are. Okay. I gather that you're saying there was cheating, quote, unquote, in those cases, but not necessarily Brady violations. Correct. But he's not, hypothetically, he's not the top policymaker. But if this is going on for an extended period of time, and there's some reason to think that his boss would have known about it, is that, would that acquiescence somehow give rise to Monell liability? I think it definitely would. How, I mean, how would that be? Well, if the facts are, as you posited, and we assume Marino is not actually a policymaker himself, but he's doing all these things, number one, if there's a high-level person who knows this is going on. And it would just be the prosecutor, him or herself, at this point, is it? Yeah, my best knowledge on it, again, pre-discovery, would be the prosecutor at the time, the elected prosecutor. If that person says, Marino's up to it again, or good job with Larkins and D'Ambrosio, we got the wins, that's an unbelievable clear-cut case of the county basically saying, this is how we do business. And I think that's a clear Monell claim there. Okay, thanks. Thank you very much. Good morning. Good morning. May it please the Court, Edmund Searby Baker, Haas-Stetler, on behalf of Cuyahoga County, I'll take the first 10 minutes. The District Court rightly dismissed the Second Amended Complaint for Failure State of Claim against Cuyahoga County. When you read the Second Amended Complaint drafted by my colleague, it's written as if they believe that liability on the part of the county and other municipal entities would derive simply from showing that Carmen Marino was a bad guy. And as this Court knows, the fundamental law in this area is there is no respondeat superior liability. Let's say Carmen Marino's doing this for 15 years, everybody knows it, and whoever his boss was didn't do anything about it. Does that state a claim of any kind? Well, let's talk about what this is, because in the complaint, in paragraph 84 of the Second Amended Complaint, they have a bare conclusory statement that what this is is a policy or practice of not disclosing exculpatory evidence. Now my colleague, having lost, wants to stand up and make it something, a much more amorphous thing. Well, let's say it's what I described in my question to Mr. Mills. Two cases that involve Brady. Right. Ten cases, apparently, that change the level of generality, as you say, to cheating or something. Marino's boss knows this is going on, does nothing. I mean, doesn't that state some kind of plausible claim? If they had proof of that, if they had facts of that. Well, this is a pleading. Right. I mean, we don't ask for proof, you know. It's just whether we can infer that there is a basis for liability, plausibly. Right, but what Iqbal tells us is we need sufficient facts to take it from the speculative to the plausible. And your question goes to exactly what's missing in the Second Amended Complaint. Essentially, what they do is they plead the Brady violation in this case and one other case, Larkins. And here we're guided by Connick. And Connick, the court said, that it is a matter of law that four prior Brady violations was not enough to put that governmental entity on notice of a need to train. So if four prior Brady- They don't have a need to train claim anymore in this case, do they? Well, they pleaded, but they haven't pursued it. They've abandoned it on appeal. Right. But the point I'm getting to is that logically if four is not enough to put a county on notice, two, really one other one, is not enough to establish what they need to establish, which is a custom or policy that is so persistent and widespread in the words of the Supreme Court in Connick or permanent and well-settled in the words of the Supreme Court in Monell, is to have the force of law. So four doesn't put you on notice. Two doesn't give rise to any plausible inference. It's simply not enough. Or go to this court's decision in Pete where they said, look, three arrests without probable cause is not enough to establish a custom or practice to violate the law. So when you look at what they need to plead, which is in paragraph 84 of their second amended complaint, there's one conclusory statement. They don't plead anything that would get us to the point you want to get to, which is notice to policy makers. I'm not saying I want to get there. I'm just trying to figure out what's plausible. Right. Well, the point you raise, I'm sorry. No, it's all right. I'm sort of joking. They don't get to that point of notice and acquiescence. So there's a basic quantitative problem in what they plead. But on exactly that point, I mean, you know, it's hard not to have some sympathy for the plaintiff in that respect. I mean, absent discovery, how the heck are they supposed to solve this quantitative problem? Just sit around and hope that somebody else has a successful habeas petition? You know, I mean, by then their claim is totally time barred. I mean, how do they get around that? Well, the fact is that these cases get litigated. And in habeas, in state post-conviction, the entire files get turned over. If they're doing what they're supposed to, you know. Right. But I've sat at the other table. I've litigated these. You get the whole file and you look through and you try to find something that you can argue wasn't turned over. So there is a way to prove this. But keep in mind the allegation they're making against the county is that the highest policymakers decided, sat down and said, you know, the Supreme Court says we have to turn over exculpatory evidence. But we're not going to do that here in Cuyahoga County. There's nothing in this complaint that would get you there. And the Supreme Court says you have to have rigorous standards of proof. Otherwise, municipal liability simply collapses into respondeant superior. All they have is two Brady violations involving the very same prosecutor. If there was something in Cuyahoga County that had the force of law, you would have other Brady decisions, and you know as hard as they've worked, they would have found them and cited to them. They can't do it. That sounds highly speculative, really. I don't know if they would have, you know, if Marino did this in 20 other cases that we'd already know about it. I have no idea. I really don't. I mean, I'm sure Marino's doing everything he can to make sure that doesn't get known by everybody. Well, the evidence that was found to be Brady in this case was left in the files. No one attempted to spoliation. Marino's an assistant prosecutor. If this was a countywide policy custom practice, you would think all the other assistant prosecutors would be doing the same thing, I guess. That's the point I'm trying to make. I mean, rather than just one. How many assistant prosecutors do they have, or did they have? You know, over the decades, we're No, no, at the time Marino was there. I think it's roughly 75 to 100 or more. I don't know the exact number. I mean, we're trying to figure out whether this is just a bad act or whether this is the practice of the prosecutor's office. Well, the fact that all you have is one prosecutor and, you know, again, the Supreme Court's decision in Connick is helpful on this point. You know, what is said in both the current opinion and the main opinion is that, you know, Brady mistakes are inevitable. And anyone who's been a prosecutor knows that mistakes do get made by offices. But the fact that all they can cite is one of these, is one prosecutor in two cases, including the case at issue, is simply not enough to plead a plausible basis that there was a county policy to violate Brady. They have another problem under the law of this court that they've never addressed, even though we've raised it a number of times, and that's this court's decision in Katie v. Aronet County. And what Katie, combined with the Sixth Circuit's decision in Pusey, says is that when you're prosecuting state crimes, Ohio County prosecutors are acting as state officials. So the effort on their part to make Marino's conduct be proof of the policy, it doesn't prove a county policy. It only would give rise to an action against the state that would be barred by the 11th Amendment. So under Katie v. Aronet County, Marino's conduct cannot establish the policy. And their other effort to essentially establish single incident liability under Pembauer fails under this court's precedent in Katie v. Aronet County. In addition, the statement that they make in there that Carmen Marino and Bill Mason had final policymaking authority is, again, the type of statement under Iqbal that's purely conclusory and is not entitled to any weight. I understand your point. I mean, who would have it? Who's above the assistant prosecutor of Marino? Is it just the county prosecutor? No. And, again, my colleague stood up and said a few things that are outside the record. I'm now speaking outside the record. Yeah, I know. I suppose I could go to a website. There's a whole other tier of management. Yeah, supervisors. In the district court's opinion, the judge in the district court was a federal prosecutor in Cleveland. He understands how the county works. So when they pled that these guys in the late 80s had final policymaking authority, I mean, there was a reaction that's implicit in the order that, no, that's absolutely not right. These guys were assistant county prosecutors. So, in the end, Iqbal talks about they're asking for a chance to do discovery. Just let us do discovery. Maybe we'll find something. His word, maybe, not mine. And Iqbal talks about, in that case, actually, there were stronger allegations of a policy involving the treatment of detainees in Iqbal than there are here. But he talks about the need to resolve these cases at the pleading stage to avoid subjecting municipalities to the very substantial cost and disruption of conducting discovery on what was occurring for decades. Here, it's completely speculative to say that the final policymakers in Cuyahoga County ever made a decision to do that. I wanted to talk for a moment about the statute of limitations, but my time may be up. Do you want to hear anything? I mean, I've read your briefs on that, and you guys didn't want an argument anyway. I mean, I'm good just with the briefs. I'm fine with that argument as well. The only thing I might highlight is we filed a 28-J yesterday. The Second Circuit came out on it. We did receive that. All right. Let's hear from the other defendants. Good morning. Good morning. Thank you, Your Honor. My name is Stephen Funk. I was retained by the City of Cleveland to represent former City of Cleveland Police Detective Leo Allen. Also with me at council table is Alejandro Cortez, who's an attorney with the City of Cleveland Law Department. So any questions you might have to the city relating to their Monell liability can be answered by him. With respect to Detective Allen, we think that the district court was absolutely correct in dismissing Detective Allen from this case. The claims that have been alleged against him personally are really based upon a faulty legal theory that he could be held liable for failing to disclose evidence to the defense. This court is pretty clear with a number of decisions that they had to allege that he failed to disclose evidence to the prosecutor. And if you look at the allegations of the Second Amendment complaint, there is no allegation that he failed to disclose evidence to the prosecutor except for one sentence in paragraph 68 in which it is said it is further believed that he even withheld documents from the prosecutor based upon differences between the prosecutor's file and the... Yeah, it seems to be your primary argument in your brief, and it's a highly technical argument, I would say. I mean, as Mr. Mills points out, there are, even in Moldawan itself, the majority opinion, there's a reference to, you know, failure of the officer to turn over materials to the defense. It almost, I mean, frankly, it seems to me more like a shorthand for how people describe the wrongful conduct in these cases. And, you know, I had an opinion in that case as well. And the way I phrased it was the violation is the officer's concealment of the exculpatory evidence. So it's not did he provide it to one person or another. The violation occurs if he simply conceals it. And why isn't that adequately applied here? I mean, that he didn't, he had a number of highly exculpatory pieces of evidence that he just concealed. He didn't give them to anybody. Well, I would say that it is not adequately applied because if you read Moldawan, it's very clear that there's a difference between that the duty to turn over evidence to the defense is the prosecutor's duty and that... Sure, absolutely. Therefore, an officer only can be held liable if they can allege and then prove that he failed to disclose evidence to the prosecutor. But if the police officer has a piece of exculpatory evidence and he just says, you know what, I'm just throwing that right in the garbage, it's gone. And somebody alleges that, you know, he concealed the evidence. The fact that they say he did, that they don't say he produced it or he failed to produce it to the prosecutor, I mean, that doesn't mean that there's no liability. The liability is from the concealment. But, again, in their complaint, they said he didn't turn it over to the defense. Paragraph 62 says to the defense. Right among other people, perhaps. Paragraph 91. And they don't say that he did what you said, which is just put it in. There's nothing in there that specifically says he didn't turn it over to the prosecutor except for Paragraph 68. And to me, legally, that makes all the difference in the world. I mean, otherwise, you know, you're essentially undercutting the difference between the prosecutor's duty and the police officer's duty. I just don't see that at all. I mean, there is a clearly different standard for the liability of an officer. It's either bad faith, a triumvetic claim, or our court in Moldawan said, you know, withholding evidence whose exculpatory value was apparent. I think it kind of merges into the same thing. But that is a totally different theory than the sort of theory that they're advocating to the prosecutor. And it's obvious from the complaint that it's a different theory. I mean, it's not merging anything. But I think both of those theories are based upon the duty to turn evidence to the prosecutor because there is no duty to turn evidence over to the defense. And if you look very closely at their complaint, they are essentially taking the laundry list of evidence that the prosecutor failed to turn over and then essentially blaming Mr. Allen for that, saying that he had an obligation to turn over the defense, and he didn't. I mean, did our court just misspeak in Moldawan when we said that the officer had liability because of his failure to, quote, turn over evidence to the defense? Or is that just a shorthand that people use in describing the injury in these cases? I don't think that it misspoke because if you read the opinion, it's very clear what the source of the liability was in that case. And that was that, and again, it was potential liability, but it was very clear in that case that it was the obligation of the officer to turn it over to the prosecutor. Everybody knows that. I mean, everybody knows that. So if everybody knows that, then that's what they should have pled in their complaint. In fact, they knew the difference because when they wanted to say they didn't turn over evidence to the prosecutor, they were very explicit about that in paragraph 68. Just one last brief question. If you're mistaken about this technical barrier to their claim going forward, would you concede that based on these, I would think, highly exculpatory pieces of evidence, that Detective Allen allegedly concealed, allegedly concealed, would you agree that those allegations do make out a claim for officer liability under this Court's decision in Moldawan and the Supreme Court's decision in Trumbetta? Your Honor, I would submit that they have to allege that he concealed evidence from the prosecutor. You've got to take my hypothetical as I give it to you. Let's say that is not a valid argument. Would you agree that the nature of the evidence at issue here satisfies the requirements of that claim, those claims? I would say that another element that they would have to allege is sufficient facts to show that Officer Allen would have known at the time that, as you indicated, readily apparent to him at the time that this was both material and exculpatory. Right. Okay. And that can't be just based upon conclusory allegations. There has to be facts that can lead to that inference. Some evidence is obviously exculpatory. Right. And since it has not been addressed, let me just briefly address the statute of limitations if I have time. That's all right. I appreciate your answers to my questions. I don't have any questions about that. Well, okay. Do you have questions on statute? Okay. You're really out of time, and I don't think the statute of limitations issue is going to decide the case myself, and I don't really know. Well, I think it's really you guys have briefed it very well, and there's a lot of things to talk about, so that's fine. All right. Anything else as to Judge Kethledge's questions? Nothing more on Detective Allen. Is there any questions you might have? I don't have any questions. All right. Thank you. Thank you. All right. So rebuttal? Mr. Mills? I would just really end where I started, that this case is nothing like the insufficient complaints in Twombly-Nickball for the reasons I stated, that the conduct alleged there fit perfectly with the defendants acting appropriately, and that's just opposite the world we're in here. How about the detective? Do you want to respond to the arguments made here? I frankly don't have much further to add to the exchanges with Judge Kethledge. I think that it's a hyper-technical argument, and I think at the end of the day, if you look past the hyper-technicality, you're left with the Moldawan case and the question of is this evidence exculpatory? Would it have been apparent to Detective Allen at the time that, for example, there was a statement in a police report saying let's dump the body in the basement? Would that be exculpatory in light of the fact that the whole case against Mr. D'Ambrosio was that the crime occurred at a creek miles away? You concede the detective has no duty to your client? I concede that in light of Moldawan and the case law, in light of this exchange, the duty is to turn over the documents and, of course, at the end of the day, to the prosecutor. I have no problem conceding that point. Connick's a tough case for you. Four instances and it wasn't enough. I know it's about training and putting people on notice, but if part of the theory here is that somebody higher up knew and let this happen, it seems like, by analogy, two instances might not be enough to infer that. I want to give you a chance to respond. I actually think Connick is a great case for us. I guess I'm going to have to explain why. You have my attention. Connick, as you say, is all about failure to train, and we go into some detail in the brief. It's all about failure to train. The reason that's really critical is because that's the only reason the point about notice is so important. It's all about does the entity or the higher-ups at the entity have notice of a problem, which means there needs to be a number of incidents and a notice, and then they can implement the training that's appropriate. In Connick, the whole claim is you failed to adequately train, and then they say, well, there wasn't enough notice. We're not really even in the Connick world because, as you say, we're not pushing that failure to train claim on appeal. We're pushing not a claim that they failed to tell prosecutors, here's how you don't cut corners, here's how Brady works. You affirmatively plowed forward in these cases as an office, and Marino is the best illustration of it, and you said this is how we're going to obtain convictions by any means necessary. And so the question is, is there enough here to say this bad apple illustrates a really poisonous tree, or is it really, truly Mr. Marino was rogue off on his own and no one else in the office did anything like what he did? And that's completely different than Iqbal and Twombly, and that's the question you face. Anything further? All right. Thank you. Thank you, counsel. The case will be submitted.